**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **WILLIAM A. PAYLOR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:05CV162 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,[1]** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying William A. Paylor's applications for a Period of Disability and Disability Insurance

Benefits under Title II of the Social Security Act and Supplemental Security Income under Title

XVI of the Act.  This case has been assigned to the undersigned United States Magistrate Judge

pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28

U.S.C. § 636(c).  Plaintiff has filed a Brief in Support of Complaint.

(Document Number 13).  Defendant has filed a Brief in Support of the Answer.  (Doc. No. 15).

**Procedural History**

On January 21, 2004, plaintiff filed his applications for a Period of Disability, Disability

Insurance Benefits, and Supplemental Security Income, claiming that he became unable to work

---

[1]This case was originally filed against Jo Anne B. Barnhart, who was at that time
Commissioner of the Social Security Administration.  On February 12, 2007, Michael J. Astrue
became the Commissioner of the SSA, and he hereby is substituted as the defendant in this action.
See Fed.R.Civ.P. 25(d)(1).

due to his disabling condition on November 15, 1993.[2] (Tr. 61-64, 104-06). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated May 11, 2005. (Tr. 52-56, 67, 12-18). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on July 27, 2005. (Tr. 10, 3-6). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.     ALJ Hearing

Plaintiff's administrative hearing was held on November 29, 2004. (Tr. 21). Plaintiff was present and was represented by counsel. (Id.). The ALJ began the hearing by admitting the exhibits into the record. (Tr. 22).

The ALJ then examined plaintiff, who testified that he was 40 years of age. (Id.). Plaintiff stated that he completed the tenth grade and obtained his GED. (Id.). Plaintiff testified that he was six feet, one inch tall, weighed 198 pounds, and was right-handed. (Tr. 23). Plaintiff stated that at the time of the hearing, he was working when he was able to at Dually Machine Shop in Dexter, Missouri. (Id.). Plaintiff explained that Dually Machine Shop is a metal shop that

---

[2]Although plaintiff alleged a November 1993 onset of disability in his application for benefits, he does not challenge the ALJ's finding that he continued to perform substantial gainful activity as a welder through October 31, 2003. (Tr. 14-15). In fact, plaintiff states in his Brief that he "has had no substantial gainful employment since October 31, 2003." (Doc. No. 13 at 2). As such, plaintiff is not entitled to benefits through October 31, 2003. See 20 C.F.R. §§ 404.1520, 416.920 (b) (if the claimant is engaged in substantial gainful activity, disability benefits must be denied).

manufactures and repairs farm equipment.  (Id.).  Plaintiff stated that he does welding, torch

cutting, and metal cutting at Dually Machine Shop.  (Id.).  Plaintiff testified that he started

working for Dually Machine Shop on a full-time basis three years prior to the hearing.  (Id.).

Plaintiff stated that he had to reduce his hours due to his medical problems two years after he

started the position.  (Tr. 24).

Plaintiff testified that he worked as a furniture salesman and delivery person at Anderson's

Home Furnishings for seven years prior to working at Dually Machine Shop.  (Id.).  Plaintiff

stated that he stopped working at that position because the business closed.  (Id.).

Plaintiff testified that he worked as a truck driver for Pepsi for a year prior to working for

Anderson's Home Furnishings.  (Id.).  Plaintiff stated that he left this position due to a pay

dispute.  (Tr. 25).  Plaintiff testified that he worked for Anderson's Home Furnishings for five

years prior to working for Pepsi.  (Id.).  Plaintiff explained that he left Anderson's Home

Furnishings for a better-paying position at Pepsi, but returned to Anderson's Home Furnishings

when the position at Pepsi did not work out.  (Id.).

Plaintiff testified that he had to reduce his hours at Dually Machine Shop because his

whole body started breaking out in welts.  (Id.).  Plaintiff stated that his feet occasionally swelled

to the extent that he was unable to walk.  (Id.).  Plaintiff testified that the swelling would subside

after a while but it would eventually return.  (Id.).  Plaintiff stated that he went to an allergy clinic

in Memphis, where they tried to pinpoint the cause of the swelling and get it under control so he

could work full-time.  (Id.).  Plaintiff testified that doctors at the allergy clinic have conducted

tests, which revealed that there are antibodies[3] attacking cells that release histamine.[4] (Id.). Plaintiff stated that this process causes the rash and swelling. (Id.). Plaintiff testified that his doctors give him medication, which relieves the itching and pain, but it does not make the swelling go away. (Id.). Plaintiff stated that his doctors are still testing him to determine the cause of the swelling. (Tr. 26). Plaintiff testified that he receives his medical treatment through the Veteran's Administration (VA). (Id.). Plaintiff stated that he is scheduled to undergo more testing in March of 2005. (Id.).

Plaintiff testified that he also experiences lower back problems. (Id.). Plaintiff stated that he takes Codeine[5] every six hours to control his back pain. (Id.). Plaintiff testified that he does not see a particular doctor at the VA but rather sees any doctor that is available. (Tr. 27).

Plaintiff testified that there is no trigger to his allergic reactions. (Id.). Plaintiff stated that he first begins to itch, next he breaks out in a rash, and then he swells. (Id.). Plaintiff testified that the episodes last three to four days but occasionally last up to a week. (Id.). Plaintiff stated that after the swelling subsides he feels sore all over, "like somebody just pummeled you." (Id.). Plaintiff testified that he finds it difficult to wear clothing when he is broken out because it is painful when his clothing rubs the swollen areas. (Tr. 28).

---

[3]An antibody is an immunoglobulin molecule produced by lymphoid cells with a specific amino acid sequence evoked in humans or other animals by an antigen. Stedman's Medical Dictionary, 96 (27th Ed. 2000).

[4]A powerful stimulant of gastric secretion, a constrictor of bronchial smooth muscle, and a vasodilator (widening of the blood vessels), that causes a fall in blood pressure. Stedman's at 823.

[5]Codeine is indicated for the relief of mild to moderately severe pain. See Physicians' Desk Reference (PDR), 2216 (54th Ed. 2000).

Plaintiff stated that he experiences the worst swelling in the facial area, feet, and hands. (Id.).  Plaintiff testified that his doctors have prescribed antihistamine[6] to relieve the itching.  (Id.). Plaintiff stated that his doctors are concerned about the swelling in his face interfering with his breathing.  (Id.).  Plaintiff testified that he avoids going outside because he needs to remain close to a telephone in case he has problems breathing.  (Id.).  Plaintiff stated that his doctors determined that the welding was not a cause of his allergic reactions.  (Id.).  Plaintiff testified that he never experienced allergic reactions when he was younger but rather it just began one year prior to the hearing.  (Id.).

Plaintiff stated that he experiences pain, itching, and swelling when he has an allergic reaction.  (Id.).  Plaintiff testified that he does not wear clothes when he has a reaction because it is more comfortable.  (Id.).  Plaintiff stated that he also gets a rash along with the swelling.  (Id.). Plaintiff described the rash as hard knots under the skin.  (Id.).  Plaintiff testified that occasionally the rash is so severe on his feet that he cannot walk and he is forced to crawl.  (Id.).  Plaintiff stated that if he has swelling in his hands then it is likely to occur on his feet as well.  (Tr. 30). Plaintiff testified that the rest of his body is not swollen but it is broken out in the rash.  (Id.). Plaintiff stated that these allergic reactions last from three to six days, subside, and then recur after a few days.  (Id.).  Plaintiff testified that occasionally the reactions recur before the soreness from the previous reaction completely subsides.  (Id.).  Plaintiff stated that he is only able to lie around the house and take medication when he has an allergic reaction.  (Id.).  Plaintiff testified that water increases the itching, so he tries not to take showers when he has a reaction.  (Tr. 31).

---

[6]Drug having an action antagonistic to that of histamine, which is used in the treatment of allergic symptoms.  See Stedman's at 102.

Plaintiff testified that his pay record reflects periods when he was unable to work and periods where his condition improved.  (Tr. 32).

Plaintiff stated that he has two children, who are 20 and 16 years of age.  (Id.).  Plaintiff testified that his wife works outside of the home.  (Id.).

The ALJ questioned plaintiff, who testified that he does not receive Medicaid benefits. (Id.).  Plaintiff stated that he does not have private medical insurance coverage and that he receives all of his medical treatment at the VA.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that his medication does not allow him to work during episodes of swelling because he is unable to operate machinery. (Tr. 33).  Plaintiff stated that he takes his medication "most of the time."  (Id.).  Plaintiff testified that his medication causes him to become drowsy, dizzy, and lightheaded.  (Id.).  Plaintiff stated that he tries to report to work each day.  (Tr. 34).  Plaintiff testified that if he begins to experience an allergic reaction, he goes home.  (Id.).  Plaintiff stated that his employer allows him to quit working if he feels ill.  (Id.).  Plaintiff testified that if he takes his medication while he is working, his employer places him on light duty.  (Id.).  Plaintiff stated that he does not take his medication daily.  (Tr. 35).

Plaintiff testified that he knows he is going to experience an allergic reaction when he begins to itch.  (Id.).  Plaintiff stated that when he starts to itch, he takes his medication and goes home.  (Id.).  Plaintiff testified that his episodes begin with itching, then a rash breaks out, and then welts develop.  (Id.).  Plaintiff stated that he has experienced rashes and swelling on every part of his body.  (Id.).

Plaintiff testified that he has degenerative disks in his lower back.  (Tr. 36).  Plaintiff stated

that he takes pain medication for his back and that he is able to work when he takes this medication. (Id.). Plaintiff testified that he is unable to lift heavy objects at work. (Id.). Plaintiff stated that his biggest problem is his skin condition. (Id.). Plaintiff testified that if he did not suffer from the skin condition he would be able to work, at least until his back condition worsened. (Id.). Plaintiff stated that his doctors have told him that they would treat his back with medication until it worsened to the extent that surgery was necessary. (Id.).

Plaintiff's attorney noted that the file only contained medical records up until March 11, 2004. (Tr. 37). Plaintiff testified that he has been seeing a doctor in Memphis at the allergy clinic every three months and he sees a doctor at the chronic clinic every six months. (Id.). Plaintiff stated that he has seen doctors several times since March 11, 2004. (Id.). Plaintiff testified that he last saw a doctor at the allergy clinic a week prior to the hearing, at which time he received the test results. (Id.). Plaintiff indicated that his doctors are still trying to determine the cause of his allergic reactions. (Id.). Plaintiff testified that his doctors told him that they can treat his allergic reactions with medication if they determine their trigger. (Tr. 38). When plaintiff's attorney asked plaintiff if he would like to add anything, plaintiff stated that he would like to return to work on a full-time basis. (Id.).

The ALJ next questioned plaintiff, who testified that he had not undergone surgery on his back. (Id.). Plaintiff stated that he does not suffer from a ruptured disk but rather he suffers from degenerative disk disease.[7] (Id.).

Plaintiff's attorney then examined plaintiff's wife, Marsha Paylor, who testified that

---

[7]A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:201 (1993).

plaintiff was "mentally hurting" due to his physical problems and his inability to work full-time. (Tr. 39). Ms. Paylor stated that she works full-time at W.W. Wood Products, which is a cabinet factory. (Id.). Ms. Paylor testified that she has worked for W.W. Wood Products for 21 years. (Id.). Upon being asked if she wanted to add anything, Ms. Paylor stated that "[w]e just want to get our life back." (Id.).

The ALJ next examined the vocational expert, Dr. Jeffrey Magrowski. (Tr. 40). The ALJ asked Dr. Magrowski to assume plaintiff's testimony regarding his limitations due to his allergic reactions was entirely credible. (Id.). The ALJ described these limitations as follows: cycles of three to six days where he is unable to do anything, he is in a lot of pain, he cannot wear clothes, he is unable to use his hands or feet if they are broken out; followed by a period during which he is free of these symptoms and can function normally. (Id.). Dr. Magrowski testified that these limitations would not permit competitive employment. (Tr. 40-41).

The ALJ next asked Dr. Magrowski to assume that plaintiff were to gain some stability over his allergy disorder, so that he was able to perform light work but would have to avoid environments that were moist, waters, fumes, and temperature extremes. (Tr. 41). Dr. Magrowski testified that plaintiff would be able to perform jobs such as a sales clerk position, of which there are 79,000 in the state and several million in the national economy. (Id.). Dr. Magrowski stated that plaintiff would also be able to perform work as a hotel clerk, of which 4,000 positions exist in the state and 176,000 in the national economy. (Id.).

Dr. Magrowski testified that plaintiff could also perform fabrication or assembly work if his condition was not aggravated by the fumes involved in welding, and that 5,000 of these jobs exist in the state and 200,000 in the national economy. (Tr. 42). Dr. Magrowski stated that these

positions are sedentary. (<u>Id.</u>). Dr. Magrowski testified that if the ALJ were to credit plaintiff's testimony as to his limitations, he would be unable to perform these positions or any other job. (<u>Id.</u>).

Plaintiff's attorney then examined Dr. Magrowski who testified that if the ALJ were to find plaintiff's testimony credible as far as the swelling and itching that occurs when he has an allergic reaction, then plaintiff would be unable to perform any work. (<u>Id.</u>).

**B.**    **<u>Relevant Medical Records</u>**

**1.**    **Records Before the ALJ**

The record reveals that plaintiff presented to Sheikh Sadiq, M.D. on October 29, 2003, with complaints of low back pain and some swelling in the lower back. (Tr. 245). Plaintiff reported that he had fallen three to four weeks prior to his visit. (<u>Id.</u>). Plaintiff walked stiffly and his movements were slightly limited. (Tr. 246). Plaintiff had limited flexion in his left leg but "fairly good" motor strength. (<u>Id.</u>). Plaintiff underwent a lumbosacral[8] x-ray, which revealed

---

[8]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. <u>See</u> <u>Medical Information Systems for Lawyers</u>, § 6:27.

early degenerative arthritis,[9] slight scoliosis,[10] and spina bifida occulata[11] of L5,[12] S1.[13]  (Tr. 216).

Dr. Sadiq's impression was low back pain, rule out radiculopathy.[14]  (Tr. 246).  He prescribed

analgesic ointment, a muscle relaxant, and heat.  (Id.).

Plaintiff saw Dr. Sadiq on November 7, 2003, at which time he complained of low back

pain.  (Tr. 238).  Plaintiff reported that he had not taken his medications as prescribed.  (Id.).  Dr.

Sadiq instructed plaintiff to take his medications as prescribed regularly.  (Id.).  Plaintiff had some

discomfort while walking, but was able to walk on his heels, toes, and tandem.  (Id.).  Plaintiff

continued to have some limited flexion in his left leg.  (Id.).  Dr. Sadiq recommended that plaintiff

rest and take his medications over the weekend.  (Id.).

Plaintiff underwent an MRI of the lumbar spine on November 10, 2003, which revealed a

bulging disc with associated degenerative disc disease at the L3-4 and L4-5 levels.  (Tr. 215).

Plaintiff presented to Dr. Sadiq on November 10, 2003, complaining of an urticaria[15] rash

over the right side of the trunk and back, and a swollen lip.  (Tr. 235).  Upon physical

---

[9]Degenerative arthritis, or osteoarthritis, is characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions; pain and loss of function result.  See Stedman's at 1282.

[10]Abnormal lateral and rotational curvature of the vertebral column.  Stedman's at 1606.

[11]A spinal defect is present, with no protrusion of the cord or its membrane, although there is often some abnormality in their development.  See Stedman's at 1671.

[12]Abbreviation for lumbar vertebrae (L1 to L5).  Stedman's at 956.

[13]Abbreviation for sacral vertebra (S1-S5).  Stedman's at 1586.

[14]Disorder of the spinal nerve roots and nerves.  Stedman's at 1503.

[15]An eruption of itching wheals, usually of systemic origin; it may be due to a state of hypersensitivity to foods or drugs, foci of infection, physical agents (heat, cold, light, friction), or psychic stimuli.  Stedman's at 1918.

examination, Dr. Sadiq found no abnormalities other than the rash. (Id.). Dr. Sadiq recommended that plaintiff stop taking all medications and then reintroduce them gradually and watch what he eats and drinks, to determine what is causing the problem. (Tr. 236). He also prescribed Benadryl.[16] (Id.).

Plaintiff saw Chun Kar Hung, M.D. on December 21, 2003, with complaints of a skin rash and itching on his trunk and lower extremities, off and on for the past two to three months, without any precipitating factors. (Tr. 228). Dr. Hung's impression was urticaria, cause undetermined. (Id.). Dr. Hung prescribed Benadryl for the itching and instructed plaintiff to keep a record to determine the cause of the urticaria. (Id.).

Plaintiff presented to the emergency department on January 7, 2004, complaining of "walnut size" flesh-colored nodules from the scalp to the plantar[17] surface of his feet and erythematous[18] raised hives. (Tr. 196). Plaintiff reported that the lesions last for two to three days and occur approximately two to three times a week. (Id.). Plaintiff denied any shortness of breath, diarrhea, constipation, abdominal pain, or nausea. (Id.). Plaintiff also reported an episode of anaphylactic shock[19] secondary to eating a peach five years prior. (Id.). Upon physical examination, Tammie Tucker-Moore, M.D. found urticarial lesions scattered on plaintiff's lower extremities. (Tr. 197). Dr. Tucker-Moore's impression was urticaria. (Id.). She prescribed

---

[16]Benadryl is an antihistamine drug indicated for the relief of allergic reactions. See PDR at 2234.

[17]Relating to the sole of the foot. Stedman's at 1392.

[18]Redness due to capillary dilation. Stedman's at 615.

[19]Severe, often fatal form of shock characterized by smooth muscle contraction and capillary dilation; typically an antibody-associated phenomenon. Stedman's at 1631.

Prednisone,[20] Hydroxyzine,[21] and Claritin.[22]  (Id.).

Plaintiff presented to Victor Farah, M.D. on February 2, 2004.  (Tr. 198-201).  Plaintiff complained of some leg and joint swelling but denied any other symptoms.  (Tr. 199).  Upon physical examination, Dr. Farah found two small urticarial itching lesions on the right side of his chest, but no other abnormalities.  (Id.).  Plaintiff reported that his lesions were not painful. (Tr. 201).  Plaintiff was prescribed Claritin and was told to return to the emergency room if he experienced any more episodes.  (Tr. 202).

On February 11 2004, plaintiff presented to allergy clinic physician Laura L. Waikart, M.D.  (Tr. 183).  Plaintiff reported that his hives occurred two to three times a week, and that the Claritin and Hydroxyzine helped relieve the itching.  (Id.).  Dr. Waikart diagnosed plaintiff with urticaria and angioedema,[23] and prescribed Hydroxyzine and Claritin.  (Tr. 184).

A biopsy performed on February 18, 2004 was consistent with urticaria.  (Tr. 192).

Plaintiff presented to the VA Medical Center on March 9, 2004, for evaluation of nicotine dependence, chronic low back pain, and allergic urticaria.  (Tr. 186-90).  Plaintiff denied experiencing any pain at that time.  (Tr. 186).  It was noted that plaintiff was working full-time as a machinist.  (Tr. 188).  Plaintiff reported that he still experienced lesions two times a week,

---

[20]Prednisone is a corticosteroid drug indicated for the treatment of allergic reactions.  See PDR at 1713.

[21]Hydroxyzine is indicated for the relief of itching caused by allergies.  See PDR at 2388.

[22]Claritin is indicated for the relief of symptoms of seasonal allergic rhinitis and for the treatment of chronic idiopathic urticaria.  See PDR at 2782.

[23]Recurrent large circumscribed areas of subcutaneous or mucosal edema of sudden onset, usually disappearing within 24 hours; frequently an allergic reaction to foods or drugs.  Stedman's at 81.

lasting two to four days each, with no chest discomfort.  (Id.).  Plaintiff had stopped taking

Hydroxyzine the previous week due to excessive drowsiness and chest discomfort.  (Id.).  Upon

physical examination, a small patch of red, irritated skin was found his foot, with no open lesions.

(Tr. 187).  Plaintiff was diagnosed with nicotine dependence, chronic low back pain, and allergic

urticaria.  (Id.).  Plaintiff was continued on his medications, which were noted to be effective.

(Id.).  Plaintiff was also advised to discontinue all tobacco use.  (Id.).

## 2. Records Adduced After the ALJ's Decision[24]

Plaintiff presented to Hsien-Ell Lai on March 16, 2004, complaining of tightness in the

chest and difficulty breathing.  (Tr. 279).  A physical examination and chest x-ray revealed no

abnormalities.  (Tr. 279, 259).  Dr. Lai's impression was:  bronchitis,[25] rule out chronic

obstructive pulmonary disease.[26]  (Tr. 280).  Dr. Lai prescribed Augmentin[27] and advised plaintiff

to quit smoking and avoid outdoor activities.  (Id.).

Plaintiff presented to the emergency room on October 4, 2004, with complaints of

---

[24]The following records were not submitted to the ALJ but were submitted to and
considered by the Appeals Council.  (Tr. 3-6).  As such, this court will determine whether the
record as a whole, including the new evidence, supports the ALJ's determination.  See Riley v.
Shalala, 18 F.3d 619, 622 (8th Cir. 1994) (where the Appeals Council considers new evidence
and declines review, it is not the place of the courts to evaluate the decision to deny review, but
rather it is the role of the courts to determine whether the record as a whole, including the new
evidence, supports the ALJ's determination).

[25]Inflammation of the mucous membrane of the bronchial tubes.  Stedman's at 250.

[26]General term used for those diseases with permanent or temporary narrowing of small
bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more
specific term can be applied.  Stedman's at 512.

[27]Augmentin is an oral antibacterial drug indicated in the treatment of infections.  See PDR
at 2978.

vomiting and headache after eating a bologna sandwich. (Tr. 273). Dr. Hung's impression was possible food poisoning. (Tr. 274). Dr. Hung reported that plaintiff was discharged, as he had improved dramatically after being given injections of Toradol[28] and Tigan.[29] (Id.).

Plaintiff presented to the emergency room complaining of headache and vomiting again on December 26, 2004. (Tr. 270-73). Plaintiff did not have chest pain or shortness of breath. (Tr. 271). Plaintiff was noted to be in no acute distress. (Id.). Dr. Hung's impression was "vomiting." (Id.). Plaintiff was given Toradol and Vistaril[30] and was discharged. (Id.).

On February 22, 2005, plaintiff presented to the emergency room complaining of headache for one day with no associated symptoms. (Tr. 268-70). A physical examination revealed no abnormalities. (Tr. 268). Dr. Hung's impression was headache, cause to be determined. (Id.). Plaintiff was given Toradol and was discharged. (Id.). Dr. Hung noted that plaintiff was to be followed by a neurologist. (Id.).

Plaintiff presented to the emergency room again on March 29, 2005, complaining of a headache. (Tr. 265-67). A physical examination revealed no abnormalities. (Tr. 265). Plaintiff was given injections of Toradol and Vistaril. (Tr. 266). It was noted that the injections provided plaintiff immediate relief and plaintiff was discharged. (Id.).

---

[28]Toradol is a nonsteroidal, anti-inflammatory drug indicated for the short-term management of moderately severe acute pain that requires analgesia at the opioid level. See PDR at 2673.

[29]Tigan is indicated for the control of nausea and vomiting. PDR at 2596.

[30]Vistaril is indicated for the relief of nausea and vomiting. See PDR at 2388.

## The ALJ's Determination

The ALJ made the following findings:

1.      The claimant met the disability insured status requirements of the Social Security Act on November 15, 1993, the date the claimant stated he became unable to work, and continues to meet them through December 31, 2008.

2.      The claimant has not engaged in substantial gainful activity since October 31, 2003.

3.      The medical evidence establishes that the claimant has urticaria and bulging disc with associated degenerative disc disease at L3-4 and L4-5, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.      The claimant's allegations of symptoms precluding all substantial gainful activity are not credible.

5.      The claimant has the residual functional capacity to perform the physical exertion and nonexertional requirements of work except for lifting more than 20 pounds and working in a wet or moist environment (20 CFR 404.1545 and 416.945).

6.      The claimant is unable to perform his past relevant work.

7.      The claimant's residual functional capacity for the full range of light work is reduced by a limitation to work that is not performed in a wet or moist atmosphere.

8.      The claimant is 41 years old, which is defined as a younger aged individual (20 CFR 404.1563 and 416.963).

9.      The claimant has the equivalent of a high school education (20 CFR 404.1564 and 416.964).

10.     The claimant does not have any acquired work skills which are transferable to the skilled or semiskilled work functions of other work (20 CFR 404.1568 and 416.968).

11.     Based on a capacity for the full range of light work, and the claimant's age, education, and work experience, Section 404.1569 of Regulations No. 4 and Section 416.969 of Regulations No. 16, and Rules 202.21 and 202.22, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

12. Although the claimant's limitations do not allow him to perform the full range of light work, using the above-cited rules as a framework for decisionmaking, credible vocational expert testimony established that there are a significant number of jobs in the state and national economies which he could perform. Examples of such jobs are: 79,000 sales, 4,000 hotel clerk, and 9,000 cashier jobs existing in the state of Missouri that the claimant could perform. In the national economy, there are several million, 176,000, and 465,000, respectively, of these jobs.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 17-18).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based upon the applications filed on January 27, 2004, the claimant is not entitled to a Period of Disability or Disability Insurance Benefits under Sections 216(I) and 223, respectively, of the Social Security Act, and is not eligible for Supplemental Security Income under Sections 1602 and 1614(a)(3)(A) of the Act.

(Tr. 18).


## Discussion

### A. Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

### B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must

significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants

with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e).  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of

medical findings and the rating of functional loss against the paragraph A and B criteria of the

Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the

impairment does not meet or equal the listings, then the Commissioner must prepare a residual

functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claim

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain

and limitation not credible.  Plaintiff contends that the ALJ applied an improper standard when

assessing the pain suffered by plaintiff.  Defendant argues that the ALJ's credibility determination

is supported by substantial evidence in the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically

determinable physical or mental impairment, direct medical evidence of the cause and effect

relationship between the impairment and the degree of claimant's subjective complaints need not

be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement

agreement between Department of Justice and class action plaintiffs who alleged that the

Secretary of Health and Human Services unlawfully required objective medical evidence to fully

corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective

allegations of pain and limitation, in doing so the ALJ "must make an express credibility

determination detailing reasons for discrediting the testimony, must set forth the inconsistencies,

and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the

consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of

the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the

medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.  See Burress, 141 F.3d at

880; 20 C.F.R. § 416.929.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when []he claims that [the pain] hurts so much that it prevents h[im] from engaging in h[is] prior work." Benksin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent him from working are credible.

In his opinion, the ALJ specifically cited the relevant Polaski factors. (Tr. 15). The ALJ then properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first stated that the medical evidence does not support plaintiff's allegations of disability. (Tr. 15). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ first discussed plaintiff's low back impairment. The ALJ noted that on November 7, 2003, Dr. Sadiq found that although plaintiff had some discomfort when walking, plaintiff was able to walk on his heels, toes, and tandem, and his straight leg raise was up to 80 degrees on the right. (Tr. 15, 238). The ALJ stated that plaintiff's neurological examination showed intact touch and localization all over. (Id.). He noted that an MRI of the lumbosacral spine revealed degenerative disc disease at L3-4 and L4-5, but there was no evidence of nerve

root compression. (Tr. 15-16, 215). The ALJ stated that the evidence does not indicate that plaintiff sought treatment for an exacerbation of back pain complaints after November 2003. (Tr. 16). This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997). The ALJ properly concluded that plaintiff's allegation of disabling back pain is not supported by the medical record. In fact, plaintiff admitted at the hearing that if it were not for his skin condition, he would be able to work. (Tr. 36).

The ALJ next discussed plaintiff's allegations of disability due to allergic reaction, beginning with a summary of the medical record. Dr. Sadiq diagnosed plaintiff with a urticaria rash over the right side of the trunk and back on November 10, 2003, and prescribed Benadryl along with a lotion. (Tr. 16, 235). Dr. Sadiq instructed plaintiff to stop all medications and gradually reintroduce them to determine which one was causing the problem. (Id.). Plaintiff was seen in the emergency department in January 2004 for complaints of an intermittent rash, with no other symptoms. (Tr. 16, 197). The examining physician found urticarial lesions scattered on plaintiff's lower extremities. (Id.). Plaintiff was diagnosed with urticaria and he was prescribed Prednisone, Hydroxyzine, and Claritin. (Id.). On February 2, 2004, plaintiff complained of some leg and joint swelling but denied any other symptoms. (Tr. 16, 199). Upon physical examination, Dr. Farah found two small urticarial lesions on the right side of his chest, but noted that plaintiff was well-developed, well-nourished, and in no acute distress. (Id.). Plaintiff reported that the lesions were not painful. (Tr. 16, 201). Plaintiff was prescribed Hydroxyzine and Claritin at this time. (Id.). A biopsy taken from plaintiff's right side on February 18, 2004 was consistent with urticaria. (Tr. 16, 192). The ALJ noted that the record before him did not contain any medical

records after March 2004. (Tr. 16).

The ALJ next discussed plaintiff's testimony regarding his skin impairment. He pointed out that although plaintiff testified that the rash was very painful, he told a VA Medical Center physician on February 2, 2004, that the rash was not painful. (Tr. 16, 201). This inconsistency detracts from plaintiff's credibility. Plaintiff also testified at that administrative hearing that the medication he takes controls the itching and pain caused by his allergic reactions. (Tr. 25-26). Evidence of effective medication resulting in relief may diminish the credibility of a claimant's complaints. See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999). Plaintiff further testified that, although his medications cause side effects that prevent him from operating heavy machinery, he is able to perform light duty work when he is taking his medications. (Tr. 34).

Plaintiff also testified that he continues to work as a welder, at least on a part-time basis. (Tr. 23-24). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).

The ALJ concluded as follows with regard to plaintiff's credibility:

> [a]fter carefully considering all of the Polaski factors, the Administrative Law Judge finds that the claimant's allegations of symptoms precluding all substantial gainful activity are not credible. There is nothing wrong with the claimant which would prevent standing, walking, and sitting throughout a work day, occasionally lifting up to 20 pounds, and frequently lifting up to ten pounds. He must avoid working in wet or moist environments. The claimant has the ability to perform light work as defined in 20 CFR 404.1567 and 416.967, reduced by his restriction to work not performed in wet or moist environments.

(Tr. 16).

The ALJ's determination is supported by the record as a whole. Although plaintiff submitted additional medical records to the Appeals Council after the ALJ rendered his decision, these records do not support his claim of a disabling skin impairment. The new records reveal

that plaintiff presented to the VA Medical Center on March 16, 2004, with complaints of tightness in the chest and difficulty breathing. (Tr. 279). A physical examination and chest x-ray revealed no abnormalities. (Tr. 279, 259). Plaintiff was diagnosed with bronchitis and was advised to quit smoking and avoid outdoor activities. (Tr. 280). Plaintiff presented to the emergency room on October 4, 2004, December 26, 2004, February 22, 2005, and March 29, 2005, complaining of headaches and vomiting. (Tr. 265-79). On each occasion, plaintiff reported no other symptoms and no abnormalities were found upon examination. (Id.). Plaintiff was given injections of Toradol and was discharged. (Id.). Plaintiff did not complain of skin lesions on any of these occasions and no lesions were noted upon examination. (Id.). In fact, the medical record reveals that the last time plaintiff sought treatment for skin lesions was March 2004. The fact that plaintiff failed to seek treatment for his skin condition disfavors a finding of disability. See Gwathney, 104 F.3d at 1045.

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). Each and every Polaski factor, however, need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

The ALJ's residual functional capacity determination is also supported by substantial evidence. Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity]

and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 711-712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogemeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

In this case, none of plaintiff's physicians imposed any restrictions on plaintiff due to his allergic reactions. Rather, they merely prescribed medication to control the pain and itching and advised plaintiff to monitor his diet and medications to determine the cause of the reactions. As discussed above, the medical record reveals that plaintiff has not sought treatment for his skin condition since March of 2004. Further, plaintiff testified that he has been working as a welder and that he is able to perform light duty work when he takes his medications. (Tr. 34). Thus, the ALJ's determination that plaintiff is capable of performing light work with the additional restriction of avoiding wet or moist environments is supported by substantial evidence.

**<u>Conclusion</u>**

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this __9th__ day of March, 2007.

_Lewis M. Blanton_
_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE